## The Case of TORR'S Estate.

### APPEAL.

Administrators, on the settlement of an account of an insolvent estate, are not entitled to be substituted for a ground landlord, whom they have paid, and receive a credit in account for the money so paid, though the intestate covenanted to pay the rent; the land being the principal debtor, and the covenant a collateral security.

But, they are entitled to be substituted for creditors, by bond secured by mortgage, whom they have paid, and to be credited in account accordingly.

THIS case came before the court on an appeal from a decree of the Orphans' Court of the city and county of *Philadelphia*.

On the 19th of *November*, 1824, auditors were appointed by the Orphans' Court to settle and report upon the accounts of *Margaret Montgomery*, late *Torr*, and *John Torr*, Administrators of *Josiah Torr*, deceased. They reported, that the balance in the hands of the administrators for distribution at the time of filing their accounts, was one thousand two hundred and thirty-eight dollars and forty cents.

On the 20th of *January*, 1826, auditors were appointed to distribute the amount remaining in the hands of the administrators, according to law, who reported as follows:—

"That the amount remaining in the hands of the administrators for distribution, is one thousand one hundred and sixty-nine dollars and eighty-two cents, and that the administrators claim an allowance for taxes, due in the life time of *Josiah Torr*, but paid since his decease, of thirty-seven dollars and twenty-eight cents, and a *pro rata* dividend on the following sums, paid by them, viz.

| | |
|---|---:|
| Ground rent, - - - - - - - - | $300 00 |
| Interest to *M. Shotwell*, - - - - - | 88 92 |
| "     *E. Barner*, - - - - - - | 270 00 |
| "     *M. & S. Fox*, - - - - - | 120 00 |
| | $778 92 |

"The amount of these several payments has been satisfactorily established, but the auditors believe they are not properly chargeable to this fund. The intestate left a large real estate, the rents of which have been received by the administrators, but are not brought into their account. The auditors are of opinion, that these sums should have been paid out of the rents of the real estate, on which the ground rent and mortgages are chargeable."

"The claim for taxes comes within the same rule, but this item was before the court on a former occasion, and was then disallowed.

(The Case of Torr's Estate.)

" The auditors, therefore, apportion the monies in the hands of the administrators as follows, viz:—

" Balance in their hands,  -  .  -  -  -    $1,169 82

" From which deduct the following expenses, incurred in the account:—

| | | |
|---|---|---|
| " 1. Advertising,  -  -  - | $6 00 | |
| " 2. Room,  -  -  -  - | 6 00 | |
| " 3. Fees of the clerk of the court, | 1 87½ | |
| " 4. Auditor's fees,  -  -  $36 | | |
| Drawing report,  -  - 10 | | |
| | — 46 00 | |
| | | 59 87½ |

Balance remaining in the administrators' hands, $1,109 94½

" Leaving, after all deductions, a balance of one thousand one hundred and nine dollars ninety-four and a half cents to be distributed, being sixty-two and two-thirds *per cent.* on the claims allowed by the auditors, to be paid to—The representatives of

"*A. Barner,* deceased, $950 79    Dividend $595 76
"*John Torr,*  -  -  .   820 50     "      514 19."

This report having been confirmed by the Orphans' Court, the administrators entered an appeal from the decree.

The exceptions taken in this court to the decree of the Orphans' Court, were:—

" 1. The disallowance of the payment made by the administrators for ground rent, due on covenant, after the intestate's death.

" 2. The disallowance of the interest paid to *Mary Shotwell* on her bond.

" 3. The disallowance of interest paid to *E. Barner* on her bond.

" 4. The disallowance of interest paid to *M.* and *S. Fox* on their bond."

*Wheeler* and *Kittera,* for the appellants, cited, *Hutton* 35. *Zouch* v. *Abbot,* 3 *Burr.* 1801. *M'Kinney* v. *Watson,* 8 *Serg. & Rawle,* 347. 4 *Johns. Ch. Rep.* 619. *Van Rensalear's Executors* v. *Platner's Executors,* 2 *Johns. Ca.* 17. *Kunckle* v. *Wynich,* 1 *Dall.* 305. *Reed* v. *The Commonwealth,* 11 *Serg. & Rawle,* 441.

*Jack* and *Randall,* for the appellee, referred to *Gordon's Law of Decedents,* 163. *Toller,* 179, 280. *Salk.* 317. *Howell* v. *Price,* 1 *P. Wms.* 294. *Talb. Ca.* 53. *Note.* 2 *Bro. Ch. Rep.* 604. *Evelyn* v. *Evelyn,* 2 *P. Wms.* 664. *Pollard* v. *Shaeffer,* 1 *Dall.* 210. *Hurst* v. *Rodney,* 1 *Wash. C. C. Rep.* 375. *Gordon's Law of Decedents,* 131, 132, 133.

The opinion of the court was delivered by

GIBSON, C. J.—This case comes before us on the report of auditors, appointed to average the debts due by an insolvent estate, the administrators claiming to be substituted for the ground landlord,

(The Case of Torr's Estate.)

whom they have paid, on the foot of a covenant by the intestate; and for creditors secured by bond and mortgage, whom they have also paid. As guardians of the children, they have received from the profits of the real estate, enough to discharge these incumbrances; and the question is, whether they are to be reimbursed out of these profits, or out of the personal assets.

It will not be contested, that in equity, both these classes would, though for different reasons, be thrown upon the land. A ground rent is emphatically a REAL incumbrance, and the covenant of the tenant a collateral security; consequently the personal assets are to be called in aid of the land, only when it is inadequate to payment of its own debt. A rent is essentially a reservation out of the profits; and so far is this carried in the case of a term which goes to the executor, that he is bound to apply them to the rent in preference to every other demand, at the peril of being answerable to the lessor for a *devastavit.* 1 *Salk.* 137. In covenanting to pay, the tenant relies on the land as the means of performance, nor does the estate which he gains in it increase the personal assets: so that it is impossible to put a case in which the land is more obviously or more conclusively the principal debtor; and being so, it is bound by every principle of justice to pay in ease of the personal assets, to which recourse can be had only to prevent an eventual failure of satisfaction. The doctrine on the subject is stated in Mr. *Coxe's* notes to *Howell* v. *Price,* 1 *P. Wms.* 294; *Clifton* v. *Burt, ib.* 679, and *Evelyn* v. *Evelyn,* 2 *P. Wms.* 664; and the authorities in support of it, leave no doubt of the solidity of the rule. It is, therefore, not to be doubted, that equity would direct the heir to keep down this species of rent out of the profits.

Debts secured by mortgage are, in equity, also sometimes satisfied out of the land. The first object of a court of equity, where it can be accomplished consistently with the nature of the debts, is to produce satisfaction of all who have a claim on the assets; consequently, the creditors of an insolvent estate, who may have recourse to the land, shall not exhaust the personal assets in the first instance: and this is on the common principle, that one who has a lien on two funds, shall not take satisfaction in a way to disappoint another, who has a lien on but one. Consequently, where specialty debts, which are a lien on the land, have been paid out of the personal assets, the simple contract creditors will be substituted for the specialty creditors so paid, and admitted to the benefit of their securities. This is the doctrine of all the elementary books, and is particularly stated in 1 *Mad. Ch.* 499.

Such then being the principles on which assets are marshalled in equity, the question is, how far we are bound to give effect to them here? It seems to me, we are bound to do so, as far as they consist with our laws of domestic origin, whether established by statute, or usage and judicial decision. But with this qualification, we are as much bound by the PRINCIPLES of equity which were in force at

(The Case of Torr's Estate.)

the declaration of our independence, and which we may execute without assuming a chancery POWER, not granted pursuant to the constitution, as we are by the principles of the common law. Equity is a part of our law; and I would just as willingly disturb the foundations of the common law, laid in the time of Lord COKE, as shake a principle of equity settled by Lord TALBOT, HARDWICKE, or NORTHINGTON. We ought to disclaim every thing like a discretion to adopt or reject, according to our notions of expediency; nor if we had the power, is there one of these principles which I would desire to reject. However they may have been strained in particular instances, they are intrinsically just in their application to the most complicated cases. As we cannot hope to see a separate administration of equity, we are bound to introduce it into our system as copiously as our limited powers will admit. How far, then, do the rules for marshalling real and personal assets, interfere with any law of our own?

To a certain extent, the legislature has subjected lands to the payment of debts. By the acts of 1700, and 1705, they are liable to execution in default of the personal estate; and by the act of 1794, the lands of an intestate may be sold by order of the Orphans' Court to supply a deficiency of the personal assets; in analogy to which, the surplus proceeds of an execution may be brought into a course of administration. But the administrator has nothing in the land except a contingent power to sell; consequently, the heir who has the estate in the mean time, subject only to divesture by an exercise of the power, is entitled to the profits. And in accordance with this, it was undoubtedly held in *M'Coy* v. *Scott*,[*] that an administrator who has collected rents and profits which accrued after the death of the intestate, holds them as a trustee for the children, and not for the creditors; and this decision is supposed to rule the case at bar. There, however, there was no question of marshalling; it being barely held that the law which gives the administrator a conditional power to sell, gives him no power over the profits. That its provisions are too scant to cover a case like the present, would seem to me, no reason to restrain the principles of equity, which are competent to the object without the aid of any statutory provision whatever. It certainly ought not to follow, because the legislature has not thought proper to make the profits assets for all purposes, that they shall be assets for no purpose; nor that we should stop short of the relief which chancery gives in particular cases, because the legislature has not thought proper to provide the same relief in all cases. It is supposed, that the order of paying debts, prescribed in the act of assembly of 1794, confounds all equitable distinctions between real and personal assets. This is obviously unfounded, the difference between these as a primary and secondary fund, being distinctly marked and carefully preserved. In *England*,

---

[*] *Ante,* page 222.

(The Case of Torr's Estate.)

the law requires nearly the same order of priority; yet, although chancery can no more dispense with a rule of the common law, than can our Orphans' Court with an act of assembly; yet, no one can suspect, that the rules for marshalling assets, interfered with this order. The legislature clearly intended no more than to regulate the distribution of a single fund among its peculiar creditors. In *Bell* v. *Newman*, 5 *Serg. & Rawle*, 85, the object of the act of assembly was declared to be equality of payment among creditors in the same degree; and, unquestionably, the object of marshalling the assets is precisely the same. By other provisions of the same act, the two funds are to be administered separately, the land becoming debtor to the *general* creditors only when the personal estate is exhausted. Here, then, are profits which, according to the principle of *M'Coy*, v. *Scott*, are not accessible to the general creditors, but which it is proposed to apply to the debt owing by the land. This, instead of interfering with the act of assembly of 1794, accords with its spirit and details, by enlarging the general means of satisfaction, instead of casting the burden which ought to be borne by the owners of the land, on those who, as regards these owners, are bound by no obligation, legal or equitable, to bear it. There is no conflict of creditor with creditor, but of creditors with heirs, who wish to benefit at their expense; and surely, it never was an object with the legislature to enable them to do so. It seems to me, therefore, that the credit claimed for payment of the arrearages of quit rent was properly disallowed. Had the administrators been charged with the profits of the land, it would have been otherwise; but as they could be received by the accountants only in their character of guardians, the whole subject belongs to another account.

But the payments in satisfaction of the mortgage debts, stand on different ground. The covenant, or obligation of a decedent to pay a mortgage given originally for his proper debt, is not an auxiliary, but the principal security; the mortgage, though charged on land, being not a real but a personal incumbrance. *Howell* v. *Price*, 1 *P. Wms.* 294, *Note*. *Clifton* v. *Burt*, *ib.* 679, *Note*. And this holds in all cases where the assets are not deficient. But in case of a deficiency, equity compels the mortgagee to exhaust the means of satisfaction afforded by the land, that the personal creditors may have all the benefit to be drawn from the personal assets consistently with entire satisfaction of the mortgage debt, *because at common law they are shut out from the land*. Now, it is obvious, that the foundation of their equity in *England*, fails here; the land being liable at law, as an auxiliary fund, to all sorts of debts, whether specifically charged on it or not. There is, therefore, no room for equitable interference on the ground of legal inequality. It is true, that the general creditors have not the same advantage in respect of priority, as a mortgagee who has a specific lien: Should he, however, elect to take satisfaction out of the personal assets, the land would be disincumbered, *pro tanto*, and its capacity to afford satis-

(The Case of Torr's Estate.)

faction to the general creditors, proportionately increased. There might, indeed, be other and younger liens to prevent this; but then, the equity of the parties to be affected being equal, a chancellor would not interfere with the mortgagee's legal right of election. It seems to me, therefore, that the administrators, standing in the place of the mortgagee, are entitled to a *pro rata* dividend of the personal assets.

HUSTON, J.—The administrators of *Josiah Torr* charged themselves with personal estate, including rents received, amounting to two thousand one hundred and eleven dollars and fourteen cents. They prayed credit for payments, amounting to two thousand nine hundred and seventeen dollars and seventeen cents. Among the disbursements were some for repairs and taxes of the real estate and ground rents paid, and interest on bonds and mortgages; the remaining payments were of simple contract debts of the deceased. Exceptions were filed to this account, and it was referred to auditors, who charged the administrators with goods and debts of the deceased, to the amount of one thousand five hundred and forty-eight dollars and forty-two cents, and gave them credit for some small matters, and found a balance against them of one thousand two hundred and thirty-eight dollars and forty cents; and they say they have prepared the foregoing, which comprises the several items allowed by them. The administrators have, as it appears, *paid considerable sums of money to different creditors of the intestate, but the estate not being solvent, all such payments have been disregarded, and the administrators were remitted to the future audit,* for distribution, for any credit claimable by them on account of them, (I suppose on account of these payments to creditors.) The auditors report that, the balance in their hands for distribution at the filing of their account, was one thousand two hundred and thirty-eight dollars and forty cents. This report was confirmed in 1824, and no appeal; but as it connects itself with a report to be made by other auditors, it has been mentioned here. Auditors were appointed in 1826, and they reported, that the administrators claimed credit for taxes accrued in the lifetime of the deceased, of thirty-seven dollars and thirty-eight cents; also, a *pro rata* dividend on the following sums paid by them, viz.—

| | | |
|---|---|---:|
| Ground rent, - - - - - - - - | | $300 00 |
| Interest on bond to *M. Shotwell*, - - - - - | | 88 92 |
| "    *E. Barner*, - - - - | | 270 00 |
| "    *M. & S. Fox*, - - - - | | 120 00 |
| | | $778 92 |

And then adds, "The amount of these several payments has been satisfactorily established, but the *auditors believe they 'are not properly chargeable to this fund.* The intestate left a large real estate, the rent of which has been received by the administrators,

(The Case of Torr's Estate.)

but not brought into their account; the auditors are of opinion, that these sums should have been paid out of the rents of the real estate on which the ground rent and mortgages were chargeable. The claim for taxes comes within the same rule, but this was before the court on the report of the former auditors, and was disallowed."

I am unfortunate in having formed my opinions of the powers and duties of executors and administrators, and the powers and duties of our Orphans' Courts, from our own acts of assembly, and from what was the practice under these acts, universally until 1815. I say I am unfortunate; for it is a misfortune to compose one of a court, who in one particular, and that depending, as I suppose, on positive enactment, adhere to decisions, in my opinion, directly contrary to legislative provisions. Having delivered my opinion in *M'Coy* v. *Scott*, as to the right and duty of administrators, where it is necessary for payment of debts, to apply rents and profits of lands to pay them, I shall say no more on that subject. The present case, however, presents enough for observation besides that. And first, this court decided in the case of *John Reed's* appeal, that the Orphans' Court had no power to decide, at the settlement of an administrator's account, on a *devastavit:* That if the administrator showed that he had paid away all the goods and chattels, rights and credits left by the deceased, to persons who were really creditors of the estate, the Orphans' Court might pass the account; and if any creditor, who alleged himself to be injured, sued the administrators, the question of misapplication of funds, and of *devastavit,* would be decided by the Court of Common Pleas. Here the very reverse is done. The Orphans' Court appoint auditors to state the administrators' accounts, who do so, but give them no credit for the payment of any debt of the intestate, whether due on specialty or by simple contract; and for this singular reason, (I quote the very words,) " *but the estate not being solvent, all such payments have been disregarded,* and the administrators were remitted to the future audit for distribution, for any credit claimable by them." Palpably, this account settled nothing, and might have been rejected for this reason; but when the second auditors sat, their report, in fact, completed what should have been done by the first auditors. The second auditors were different persons; and their proceedings are not only different, but inconsistent, yet both are affirmed.

The first auditors say, the rents, issues, and profits of the land, cannot be brought into the administrators' account, and they reject these matters from both sides of the account. The second auditors say distinctly one of two things, either that these rents and profits ought to have been brought into the account, and be set opposite the payment of ground rents, and interest on bonds and mortgages, or that an administrator must not pay taxes due by the intestate, or money due on a lease, where there is an express covenant by the intestate; and, that the administrator is not bound to pay a bond debt, if there is a mortgage to secure the debt.

(The Case of Torr's Estate.)

I have said before, this court decided in *M'Coy* v. *Scott,* that rents could not be brought into an administrator's account; that is, that the Orphans' Court had no power to charge him with the rents, even where he has received them, and at the time of settlement has the money in his hands. But these auditors have, in effect, charged the administrators. They say distinctly, the administrators have paid seven hundred and seventy-eight dollars and ninety-two cents of ground rents and mortgage debts, but they ought to have paid this with rents received. In point of fact, the rents were less by more than two hundred dollars than seven hundred and seventy-eight dollars and ninety-two cents; so that the administrators are not only deprived of a credit equal to the rents said to have been received, but also of two hundred dollars more; because, to use the words of the last auditors, these sums *are not chargeable to this fund.*

In *England,* it is true, simple contract debts do not bind the lands of a deceased. They must be recovered from personal estate, or they are lost. Debts by bond, in which the heir is named, bind lands. And if the bond creditor gets his debt from personal estate, the chancellor puts the simple contract creditors in the place of the bond creditor, to affect the land; in other words, the bond debt being a lien on the land, and the simple contract debt not a lien on it, the chancellor will compel the bond to be paid out of the land, at least, so far as to leave enough of personal estate to pay the simple contract creditors, and this is called marshalling assets; that is, compelling each debt to come from the fund which it alone can affect. But in this country, every debt equally affects the real and personal estate of a deceased. A judgment for a tradesman, or shopkeeper's account, sells land, if there is no personal property, just as a judgment on a bond, recognisance, or mortgage does; or, the Orphans' Court decree a sale to pay the one, as well, and as readily as to pay the other. Is there, then, any meaning in the words, not *chargeable to this fund?*

This is not all; the auditors struck out all payments on simple contract debts. The court had none before them. The administrators, then, claimed credit for the payments above stated. The credit was refused them. What are these administrators to do with the personal property? They must not pay the bonds, because there is a mortgage to secure that money; and they must not pay it to simple contract debts, for there are bonds. The whole of the money, says the Orphans' Court, must go to two bond creditors, who have no mortgage. Now, it is part of the case, that all the lands have been sold, and have not satisfied the money due on the mortgages. The Orphans' Court, however, decided, that the residue on these bonds and mortgages was not entitled to a *pro rata* allowance. One other judge of this court, however, agrees with me, that the administrators are to be allowed for their payments on the bonds; but a

(The Case of Torr's Estate.)

majority of the court say, he is to have not even a *pro rata* allowance for the ground rent, or for the taxes.

The facts are, *Josiah Torr,* the intestate, was the lessee. He executed the lease, and in it an express covenant, binding himself, his heirs, executors and administrators, to pay the rent; subject to this he had the property in fee. Subsequently to this, he mortgaged the property. Now, in the first place, if the ground rent had not been paid by the administrators, it would have come in prior to the mortgage debt, and so much the more of the latter would have been unpaid; but also, in this case, it was an express covenant under seal, a debt by specialty, which the administrators were bound to pay. If an action of debt, or covenant had been brought on it, such action could not have been brought against any other than the administrators. I know of no case in which the heir, as such, can be sued in this state for a debt due by his ancestor. He may be named as a terretenant in a *Scire Facias* on a mortgage, but the executors or administrators must be sued, and a judgment had against them before the land can be touched. If there are no administrators, the mortgagee or other creditor, must procure some person to administer. So, the heir may be sued in debt for rent, as assignee. If, then, the administrators had been sued on this covenant, they could not have resisted the suit; if they had pleaded *plene administraverunt,* still the plaintiff would have recovered *pro rata,* with other specialty creditors. The administrators, by *McCoy* v. *Scott,* could not, if they had the rents in their hands, apply them *to pay this* or any other judgment against them. We have, then, a case where administrators must pay a debt contracted by the intestate, and cannot pay it out of either real or personal estate.

If *Josiah Torr* had not been the person who covenanted to pay this ground rent, if he had been the assignee of the covenantor, and only liable as occupant, and assignee in debt, and the property had gone into the hands of his heirs, perhaps, his administrators would not have been liable under our decisions.

1 *Salk.* 317, has been cited on both sides. If I understand that case, so far as it can be applied to the state of facts and law in this country, it is an express decision, that the administrators were liable to an action on this covenant, and must pay it *pro rata;* and wherever administrators are compellable by suit to pay, they may pay without suit.

As to the taxes due in the lifetime of *Josiah Torr,* and paid by the administrators, the law is, by act of assembly of the 11th of *April,* 1799, section fifteenth, if any person shall neglect or refuse to make payment, within thirty days from the time of demand, it shall be the duty of the said collector to levy the tax by distress and sale of the goods and chattels of the delinquent. If, then, the administrators had not paid this tax, the collector would have levied and sold a portion of the goods. The administrators could not have prevented this; they could not have replevied the goods distrained. Against

(The Case of Torr's Estate.)

this plain act of assembly, we have, to be sure, one decision of this court, though the section was not referred to in the argument; and after this, there is nothing left for it, but the administrators must let the collector sell, and the children or creditors must bear the loss of a forced sale.

This doctrine of different funds to be applied to the payment of debts, according to different rules, comes to us under a respected and imposing name.   So far as I can recollect, it .is first distinctly mentioned by the late Chief Justice in the *Agricultural Bank* v. *Stambaugh,* 13 *Serg. & Rawle,* 299.   The principle decided in that cause has not, I believe, been ever questioned; but the *dicta,* and they are only *dicta,* for they were not necessary to decide the cause, I entirely dissent from and deny.  It is there said, if any creditor of a deceased gets a judgment, and levies it on personal property, he gets the whole of his debt, though other creditors of a higher class get nothing; and that after the personal assets are exhausted, the creditor may get a judgment *de terris;* and as to the proceeds of lands sold, the creditors are entitled, according to the act of assembly.   To me, it seems, the first position is against the express words and spirit of our written law, and equally contrary to all prior decisions on that law.

In *Wootering* v. *Stewart's Executors,* 2 *Yeates,* 484, it was conceded by the counsel, that as respected personal property, the order of payment prescribed by the act of assembly must govern, but contended, that this did not apply to money raised by the execution of one creditor by sale of lands, which were there called an auxiliary fund, and were said not to have been in the contemplation of the legislature.  The court decided, there was no difference.  In *Prevost* v. *Nicholls,* 4 *Yeates,* 487, the opinion of the court was delivered by YEATES, Justice.  The sum was large, the cause fully considered. That judge had the experience of half a century of full practice at the bar and on the bench.  Of him, I can say, that although I have known many men, whose legal knowledge on some points, some branches of the law, was as great and as accurate as his, yet he knew more law than any person with whom I have been acquainted.   In · every department of the law known and used in this country, he was skilled; civil or criminal, local or general, common or statute law, he was at home in all of them.  Where our acts of assembly had introduced practice or principles different from the law of *England,* he was pre-eminently superior.  The habit of taking full notes of all decisions, of revising and comparing them, would alone have given him a vast advantage over those who depended on memory alone. In addition, he had a quickness of apprehension seldom equalled; powers of discrimination of the very first order; his industry never flagged, and his judgment seldom erred.   In that case too, it was admitted, that the act of assembly must give the rule as to personal assets.  He says, "It has from the earliest times made no difference, whether the assets arose from the sale of real or personal estate.

(The Case of Torr's Estate.)

Though the personal representatives of the deceased might, by their *bona fide* acts, conclusively define the extent of the claims of the different creditors, they could not vary the vested interests of the different creditors, nor change the order of payment, for this would militate against the express provisions of the law. Neither did the report of the referees, nor the judgment of the court thereon, go further than to ascertain the amount of Mrs. *Wilson's* demand. They left the order of payment to be fixed by law, according to the nature of the debt. It can be of no moment which of the judgments is first in point of time against the administrators. Priority of payment must depend, in case of deficiency of assets, on the nature of the demand at the time of the death of the debtor."

The case *ex parte* of *Meason*, in 5 *Binn.* 167, establishes fully the same doctrine, and there Chief Justice TILGHMAN goes fully into the doctrine. An administrator is entitled to retain, because, if he could, he would give the first judgment to himself. He has the same rights as if he had the first judgment, but he has no preference, but comes in *pro rata* with other creditors of the same class.

The matter is of immense importance in this city, and the old and rich counties, where large personal estates, and still larger debts are common. A man dies, leaving a personal estate of twenty thousand dollars, and debt, to the amount of forty thousand dollars, and leaves his widow, or son, or some friend equally poor, his executor—can this executor, by confessing judgment, or letting a judgment be obtained for a *bona fide* debt, by simple contract, to friends, give these friends the whole property, to the exclusion of others of equal degree, or of creditors by bond or by judgment?

It has been said, that none but the executor or administrator can apply for auditors to apportion the estate. I doubt this. But it is not necessary to discuss that point. In none of the cases above cited, were auditors applied for or appointed, yet the court decided, in each of them on the application of those interested; and can they themselves appoint auditors to distribute the money, or rather, to apportion the sums to the several claimants, according to law? If the executor or administrator has paid the money to one creditor wrongfully, there may be difficulty; but if the money is raised by execution, I contend, the sheriff ought, at his peril, to pay it into court, at least, where he has notice from any creditor; and that when in court, it must go as directed by the act of assembly, without regard to the source from which it has been raised.

I equally deny the second position, that after the personal estate is exhausted, the creditor may get a judgment *de terris*, and sell the lands. He can sell them on his first judgment against the representatives of the deceased, by the act of assembly of 1700, expressly, and by the invariable practice since. Judge WASHINGTON first used the expression in 1 *Pet. C. C. Rep.* "All lands and houses whatever within this government, shall be liable to sale upon judg-

(The Case of Torr's Estate.)

ment and execution obtained against the defendant, the owner, his heirs, executors or administrators, where no sufficient personal estate is to be found." Act of assembly of 1700. No second judgment is contemplated, and none has been used against executors more than against the defendant in his lifetime; and land can no more be sold in the lifetime of the defendant, where personal property sufficient can be found, than they can after his death. There is no process to obtain this second judgment; no pleadings have been invented or used in the preparatory stages. The same execution may be, and often is levied on personal and real estate at the same instant, and after sale of the former, proceeded on as to the latter. No form of judgment *de terris*, known to the law, would be good. The creditor is not bound to wait for goods which may never arrive, after he has got his judgment *de terris*, which is always confined to particular lands, or at least, to lands; and, before he has taken out his execution, a ship may arrive with personal property sufficient, and then the lands cannot be sold. How is the creditor to get clear of it? There can be no such judgment in such a case. The expression is objectionable, as countenancing the idea of two distinct funds, to be governed by different rules. The farming utensils, or the ship, may be called an additional fund to the household furniture; but the expression is not correct. They all form but one fund, and only increase the amount of that fund. All the property is a fund for the payment of the debts of the debtor, living or dead. The personal property, if sufficient, to be exhausted first in order, and sold without the formality of inquisition or sheriff's deed.

I contend, then, in case of an insolvent estate, that by all courts, Orphans' Court or Court of Common Pleas, when the money is in court, the order prescribed by the fourteenth section of the act of assembly, is to be followed, whether the money was raised from real or personal estate: That the debt due on this lease, and on these bonds were equally entitled to a proportion *pro rata;* and that the administrators who have paid part on the lease, should have been allowed for such payments made by them, out of the personal estate; and should have been allowed for the whole of the taxes due at the death of *Josiah Torr*. The collector could have levied and sold the personal property for those taxes. They were no lien on the land, and the administrators did right in paying them.

Smith, J. concurred with the Chief Justice. Rogers, J. and Tod, J., not having heard the argument, took no part in the cause.